## WABASH RY. CO. v. ZAYAC.

Circuit Court of Appeals, Seventh Circuit. February 21, 1929.

No. 3992.

L. V. Hill, of Hillsboro, Ill., for plaintiff in error.

J. Earl Mayor, of Hillsboro, Ill., for defendant in error.

Before ALSCHULER, PAGE, and ANDERSON, Circuit Judges.

PAGE, Circuit Judge. On June 14, 1925, at 5:55 a. m., the engine of defendant's passenger train of nine cars struck the automobile of, and killed, John Zayac, on the highway where it crosses three of defendant's tracks, three blocks inside of the city limits of Staunton, Ill., a place of some 6,000 people. The plat below shows the crossing:

Standing at *a*, facing the crossing to the west *b*, one would be within a 20-degree angle, formed by the highway *c*, along which Zayac was driving toward the crossing in his open uncurtained Ford car, and the railroad tracks *d*, on the middle one of which the train moved west towards the crossing.

After defendant's motion for a directed verdict was denied, there was a verdict, and judgment thereon, for plaintiff, Zayac's administrator.

Defendant contends that Zayac was guilty of contributory negligence.

It is not claimed that a speed of 60 to 70 miles per hour in itself constituted negli-

gence, but it is claimed that dense fog, weeds, a warning sign, and failure to have a watchman at the crossing, together with the speed of the train, constituted negligence.

Three witnesses for plaintiff testified to a train speed of from 60 to 70 miles per hour. Not one of them showed any experience that specially qualified him to judge of the speed of trains. One of them had given a statement contrary to his testimony on the stand, and another could not tell whether the house in which he lived was 20 or 2,000 feet long. Each judged of the speed of the train from a position practically in front of the train. It is hardly possible that the train, shown to have a slow schedule all the way from Litchfield to St. Louis, and which lost one minute in coming 14 miles from Litchfield to Staunton, on a schedule that was less than 36 miles per hour, was going at nearly double that rate of speed at the crossing. The train ran 3,000 feet before it was stopped, the reason given by the trainmen being that the rails were slippery from a heavy dew. The trainmen said they had not measured the distance, but estimated that the stop was made in 1,800 to 2,000 feet. That statement is urged against them as showing their unreliability. At the same time, they said that when the train stopped, the engine was 200 feet east of the station, which was some 3,400 feet west of the crossing. Whereas, plaintiff's witnesses said that the engine was 300 feet east of the station.

The only testimony that there was any fog at any time in the morning comes from plaintiff's witnesses. One testified that it was very foggy about 5:10. Another said that it had cleared up toward 6 o'clock, but that there was a fog at 6 o'clock. What the fog amounted to at that hour is not shown, but that it could not have hidden the train or perceptibly obscured Zayac's vision is made clear by the testimony of plaintiff's witnesses as to objects seen by them. One witness, 200 to 300 feet from the crossing, saw the automobile, headed west, with people in it, stop at the crossing. Another, 300 feet south of the crossing, saw people in both seats of the automobile as it stopped 10 or 15 feet from the north track. Another, who was at an ice house 900 feet south of the crossing, saw, after the crash, the car carried upon the engine pilot, saw a man on the running board moving his legs, and saw a girl in the car with a red hat on.

The evidence as to the trespass sign and the weeds is likewise from plaintiff's witnesses and plaintiff's photographs. It shows that, starting on the highway at a point 100 feet east of the crossing, there was a rise of four feet, to the top of the tracks. The sign was 186 feet east of the crossing. Its face was 2½ feet horizontally and 1 foot 8 inches vertically, with its lower edge 5 feet from the ground. There is also evidence that the weeds on the right of way were 5 feet high. But the uncontradicted evidence is that both the weeds and the sign were on ground lower than the tracks, so that, while the sign was 6 feet 8 inches high, its top was only 4 feet 3 inches above the tracks. The train engine was over 13 feet high. The nearest edge of the sign was 10 feet 7 inches from the north rail of the north track, and over 23 feet from the center of the track on which the train was moving. Zayac was sitting in his automobile 10 to 15 feet from the north rail. It seems not possible that either the sign or the weeds could in any way have obstructed his view.

The evidence is that there was no watchman at the crossing. It was Sunday morning, and it appears that about 150 automobiles passed over the crossing between 5 and 7 in the morning. Whether in view of the rule laid down in Grand Trunk Ry. Co. v. Ives, 144 U. S. 408, 421, 12 S. Ct. 679, 36 L. Ed. 485, the jury would have been justified in finding negligence because there was no watchman at the crossing, we do not deem it necessary to decide.

This evidence is discussed for the purpose of showing how unsubstantial most of it is at best, because plaintiff urges that the speed of the train, combined with the fog, and obstruction of the view by the sign and weeds, was so great that plaintiff ought to prevail, even though her intestate was guilty of contributory negligence.

Several of plaintiff's witnesses testified concerning the noise made by the train. One had his attention directed to it by the great noise it made when it was more than a quarter of a mile from him. Another, who was 200 or 300 feet nearer the train than Zayac, saw him at the crossing and heard the train come "roaring down the track." This witness went out of his house to a well to get some water. How far he had to go, or what else he did to get the water, does not appear. He said: "I saw the train coming before I went to the well. Had got the bucket of water and started back. I was watching the train. Just before I entered the door, I heard the crash." The presumption is that Zayac's sight and hearing were good. If others, who were not looking for the train, saw it and heard it come "roaring down the track," plaintiff cannot be heard to say that

Zayac, whose duty it was to see and hear the train, could not, in the exercise of ordinary care, have either seen or heard it. If one witness saw it a quarter of a mile away, and if another, between the time he saw the train and the time he heard the crash, had time to leave his door, go to his well, get a bucket of water, and return to the door, it would seem that Zayac did not have to be hurried in what he did.

Plaintiff's witnesses were not better qualified, and no more favorably situated, to judge of the speed of the train than Zayac. In these days, when the public demands a high rate of speed in trains and practices a no less high rate of speed in the use of its automobiles, a high degree of care is necessary. The danger is not all to those traveling upon the highways, but is to travelers upon the trains, as well.

The tracks were straight as far as the eye could see. There was nothing that obstructed the view for a long distance. We must hold that, within the standard of conduct laid down in B. & O. R. Co. v. Goodman, 275 U. S. 66, 70, 48 S. Ct. 24, 72 L. Ed. 167, 56 A. L. R. 645, Zayac was guilty of contributory negligence.

Judgment reversed.