# BALTIMORE AND OHIO RAILROAD COMPANY

*v.*

## ADAMS.

---

NEGLIGENCE; CONTRIBUTORY NEGLIGENCE; PLEADING AND PRACTICE; SPECIAL VERDICTS; RAILROADS; CROSSINGS; GATES.

1. A person who hires a public conveyance and gives the driver directions as to the place to which he wishes to be conveyed, but exercises no other control over the conduct of the driver, is not responsible for his acts of negligence, or prevented from recovering from a railroad company for injuries suffered from a collision of its train with the conveyance, caused by the negligence of both the managers of the train and of the driver.

2. It is proper when a special verdict can be had for a trial court to direct such a verdict; but no more in regard to special than to general verdicts is it proper to submit to a jury questions of fact not raised by the evidence, or questions which under the condition of the evidence it is proper for the court itself to determine.

3. In the absence of statutory requirement or proof to the effect that a railroad crossing is especially dangerous, it is error to submit

the question to the jury of whether or not it was negligence on the part of the railroad company to fail to maintain gates at such crossing.

4. Testimony showing that horse races were in progress at a point near a country railroad crossing, but not showing that they brought any unusual concourse of people to the neighborhood of the crossing, and testimony showing that there was an embankment near the crossing which at certain points rendered impossible any extensive view of the road, will not be sufficient proof of the dangerous character of the crossing so as to justify the submission to the jury of the question of whether or not the failure of the railroad company to maintain gates at such crossing was negligence.

No. 580.  Submitted January 7, 1897.  Decided February 9, 1897.

HEARING on an appeal by the defendant from a judgment on verdict in an action to recover damages for death by alleged wrongful act.  *Reversed.*

The COURT in its opinion stated the case as follows:

This is a suit brought under the act of Congress of February 17, 1885, for the recovery of damages for death alleged to have resulted from the wrongful act or negligence of the appellant, the Baltimore and Ohio Railroad Company, or its agents.

On March 1, 1893, which was only a few days previous to the last presidential inauguration, there were horse races in progress at Ivy City, so-called, a short distance to the northeast of the northern boundary line of the city of Washington, and adjoining the track of the Baltimore and Ohio Railroad Company extending from the city of Washington to the city of Baltimore.  Edwin H. Blackman, the intestate of the appellee, a young man a little over twenty-one years of age at the time, and a companion, another young man of about the same age, one McDonald, attended the races on the afternoon of the day mentioned.  About five o'clock in the afternoon they left the race ground, entered a cab driven by one George Dent, and directed him to, drive them to Willard's Hotel, in Washington.  At the same time one Johnson got on the box outside with the driver, for the pur-

pose of being brought into the city. The cab at the time seems to have been standing on the northwest side of the railroad track, on a road known as the Mount Olivet road, which crosses the track almost at right angles. The railroad, it may be remarked, skirts the race ground on the southeast side; and it seems to have been deemed convenient to cross the tracks from the northwest to the southeast in order to reach a convenient road leading into the city of Washington.

The driver Dent proceeded towards the railroad track; but when he had come quite close to it, he descended again from his box, and proceeded to adjust the door of his carriage, or in some way to close his carriage so as to exclude the cold, of which he says the occupants complained. Mounting again to his place on the box, he proceeded to drive across the track, without stopping to see or hear whether any train was coming, without taking any precautions whatever such as the most ordinary prudence would have dictated under the circumstances, and so far disregarding the warning of a boy who was standing near and who tried in vain to stop his carriage as to make a vicious stroke at him with his whip. His carriage was right on the track when an express train, one of the usual express trains moving on schedule time, came from the direction of Baltimore, and struck and wrecked the carriage. The driver Dent seems to have escaped without serious injury, as did also his companion on the box, Johnson, who leaped in time to save himself. Of the two occupants of the inside, McDonald escaped with comparatively slight bruises, but the injury to Blackman was serious, and, as it is testified, resulted in his death in the following month of April. The train was stopped; he was taken into one of the cars, and upon the arrival of the train in the city was removed to one of the hospitals, whence, after the lapse of five days, he was taken to the house of his mother, the appellee in this cause.

Thus far there seems to be no controversy in regard to

the facts of this case. But there is controversy as to the course and conduct of the two occupants of the carriage, the deceased and his companion. There is testimony tending strongly to show that it was at their instance and in pursuance of their commands that the driver of the carriage so recklessly drove upon the railroad track; but this is controverted by witnesses for the plaintiff. There would seem to be little doubt, at all events, notwithstanding the denial of McDonald, that the young men had been drinking immoderately during the day, and that immediately preceding the accident, and at the time thereof, they were so far under the influence of liquor as to have become reckless.

There is also controversy in the testimony in regard to the alleged negligence of the officers or agents of the railroad company in failing to give due notice of the coming of the train by the ringing of the bells or the sounding of the whistle of the engine in proper time before the train reached the crossing. But this contention was settled on behalf of the appellant, the defendant below, by a special verdict by the jury upon that point; and therefore, it requires no consideration by us, even if it were not otherwise a matter to be relegated to the jury. But the jury, it seems, specially based its verdict on the failure of the railroad company to keep a flagman or to maintain gates at the crossing in question, neither of which it is conceded that the company did.

At the conclusion of the testimony, the counsel for the defendant requested a peremptory instruction to the jury to find a verdict for the defendant. Upon the refusal of the court so to do, is based the appellant's first assignment of error. A second assignment is based upon the alleged error of the trial court in submitting to the jury to determine, as a question of fact, whether it was not negligence on the part of the railroad company not to maintain gates or a flagman at the crossing in question.

*Mr. Geo. E. Hamilton* and *Mr. M. J. Colbert* for the appellant:

1. The case of *Little* v. *Hackett*, 116 U. S. 366, lays down the principle that a person who hires a public hack and gives the driver directions as to the place to which he wishes to be conveyed, but exercises no other control over his conduct, is not responsible for the negligence of the driver. On the other hand, if the passenger does exercise control over the driver of such a vehicle and does undertake to control or direct his movements, then the relation of principal and agent or master and servant arises between the parties, and the negligence of the servant must be attributed to the master. In the present case the evidence was overwhelming that the driver was acting under the direction and control of the men in the carriage, and his act was their act. *Railroad Co.* v. *State,* 70 Md. 335.

2. It appears from this record that the court allowed the jury to base their verdict upon the failure of the defendant to maintain gates or a flagman at a country crossing in a case where it has been determined the defendant not only gave the usual signal of the approach of its train to the crossing, by sounding the whistle, but also had provided automatic electric bells in accordance with the requirements of the municipal authorities. This we submit is not justified by the great weight of authority, and it is not justified by the evidence contained in this record. This question has been twice passed upon by this court. *Railroad Co.* v. *Golway,* 6 App. D. C. 143; *Railroad Co.* v. *Hunter,* 6 App. D. C. 287.

In the latter case the court says: " Extraordinary precautions such as keeping flagmen at every or at any particular crossing are not to be imposed upon street railroads at the option of a jury in a particular case." And for a much stronger reason could it be said that extraordinary precautions are not to be imposed upon steam railroads at

every country crossing in the option of the jury where the law-making power has not required it; and so are all the authorities. *Railroad Co.* v. *Converse,* 139 U. S. 469; *State, to use of Foy,* v. *Railroad Co.,* 47 Md. 76; *Haas* v. *Railroad,* 47 Mich. 401.

In the case of *Railroad* v. *Ives,* 144 U. S. 408, it was held that before a jury would be justified in saying, in the absence of any statutory direction to that effect, that a railroad company should keep a flagman or gates at a crossing it must first be shown that such crossing is more than ordinarily hazardous, and a jury would not be warranted in saying that a railroad company should maintain a flagman at ordinary crossings in the country; and numerous authorities are cited in support of the doctrine thus laid down. To the same effect is the case of *Crawford* v. *Railway Co.,* 55 N. Y. Sup. Ct. 50. See also *Beisiegel* v. *Railroad Co.,* 40 N. Y. 9; *Railroad* v. *Asbury,* 120 Ind. 289.

A railroad company is not chargeable with negligence in failing to maintain gates or provide flagmen at a crossing in the absence of a statutory obligation to do so; and, therefore, it is error to refuse to charge, in an action for injuries at a crossing, that no negligence could be imputed to the company from the absence of a flagman or failure to maintain gates at the crossing. *Cohn* v. *Railroad Co.,* 39 N. Y. S. 986; *Railroad* v. *Gaffney,* 9 Ohio Cir. Ct. 32; *Commonwealth* v. *Railroad,* 101 Mass. 201; *Case* v. *Railroad,* 75 Hun, 527; *Railroad* v. *Herman,* 39 Ill. App. 287; *Vallance* v. *Railroad Co.,* 55 Fed. Rep. 364.

The rule to be gathered from these decisions is that the court is not justified in submitting to the jury the question of determining as matter of fact whether or not a railroad company is negligent in not providing extraordinary precautions at a point where its tracks cross the public highway at grade, unless the evidence discloses a situation that is unusually hazardous to travelers on the highway.

*Mr. Henry E. Davis* for the appellee :.

The questions presented by the appellant's brief are only two, namely: 1st, whether the conceded negligence on the part of the driver of the vehicle is imputable to the appellee's intestate, and, 2d, whether the trial court was justified in submitting to the jury to determine whether the appellant, under all the circumstances, should have erected gates or stationed a watchman at the crossing.

1. As to the first question, the law is too well settled to require more than its mere statement. "A person who hires a public hack and gives the driver directions as to the place to which he wishes to be conveyed, but exercises no other control over the conduct of the driver, is not responsible for his acts or negligence, nor prevented from recovering against a railroad company for injuries suffered from a collision of its train with the hack caused by the negligence of both the managers of the train and the driver." *Little* v. *Hackett,* 116 U. S. 366.

"The contributory negligence of a driver of a public or private vehicle, not owned or controlled by the passenger, and who is himself without fault, will not constitute a bar to the right of the passenger to recover against the railroad company for injuries received by a collision of its train with the vehicle." *Railroad Co.* v. *Hogeland,* 66 Md. 149; *Railroad Co.* v. *State,* 79 Md. 335.

2. As to the second point the law is equally well established. *Railway Co.* v. *Ives,* 144 U. S. 408; *Railroad Co.* v. *Golway,* 6 App. D. C. 143.

Mr. Justice MORRIS delivered the opinion of the Court:

1. With reference to the first assignment of error, we do not find that the testimony in the case was such as to justify the trial court in giving the peremptory instruction requested by the appellant.

It is conceded that the law upon this point has been settled for us by the Supreme Court of the United States in

the case of *Little* v. *Hackett*, 116 U. S. 366.   In that case it was held that " a person who hires a public conveyance and gives the driver directions as to the place to which he wishes to be conveyed, but exercises no other control over the conduct of the driver, is not responsible for his acts or negligence, or prevented from recovering against a railroad company for injuries suffered from a collision of its train with the conveyance, caused by the negligence of both the managers of the train and of the driver."   The converse of this proposition was likewise affirmed by the court in the same case, to the effect that, if the person injured has exercised control over the conduct of the driver beyond the mere giving of directions to the latter as to the place to which he desires to be conveyed, and the injury complained of was the result in part or in whole of the conduct of the driver acting under such control, the relation of master and servant must be deemed to have existed and the negligence of the servant becomes in law the negligence of the master, and the latter must bear its consequences.

If it appeared conclusively that such control had been exercised in this case by the deceased, Edwin H. Blackman, over the driver, George Dent, there would be no question in regard to the application of the rule; for the negligence of Dent, amounting almost, if not actually, to criminal recklessness, is beyond all doubt upon his own testimony, and it seems to be conceded by counsel for the appellee.   But there is conflict in the proof in this regard; and although we may consider that the testimony greatly preponderates against the contention of the appellee, that there was no such exercise of control by the deceased, yet there was some testimony in favor of the contention, and sufficient, as we think, to be submitted to the jury.

2. After the refusal by the trial court to give the peremptory instruction requested by the defendant, other requests for instructions were presented to the court by both sides; but these it is unnecessary to state here, inasmuch as no

assignment of error is based upon the action of the court in regard to them. To one passage, however, in the general charge which the court then proceeded to give to the jury, there was exception taken by the defendant, which is brought here by the second assignment of error, and upon which the appellant most strenuously relies. The passage in question was at the end of the charge, and is as follows:

" Now, gentlemen, inasmuch as it may be material for the court to know upon what grounds you base your verdict, in case you find for the plaintiff, I have concluded to have you answer two interrogatories which I will give you. You need not answer them except in the event that you find for the plaintiff. . . . Each is answered by yes or no.

"Do you find that the defendant was negligent in failing to sound the whistle and ring the bells in time to give proper warning of the approach of the train?

" This is the first one.

"Do you find that the defendant was guilty of negligence in not maintaining gates or a flagman at the crossing in question?

"In other words, if you find for the plaintiff, I think it may be important for the court to know upon what grounds you base your judgment that the defendant was guilty of negligence."

We do not understand that the appellant complains of the requirement of the trial court that the jury should render a special verdict, or something in the nature of a special verdict upon questions of fact involved in the case. We think that there is eminent propriety in the practice of recourse to special verdicts, when such verdicts can be had, and especially in cases of the character of the present case, inasmuch as by such special verdicts much of the injustice often complained of as resulting from the sympathy or the prejudice of juries may be to some extent obviated. Special verdicts are provided for by statute law in many of the States of our Union; and in England at

present they seem to be the rule rather than the exception
in judicial proceedings wherever they are applicable.

But, of course, no more in regard to special than to gen-
eral verdicts is it proper to submit to a jury questions of fact
not raised by the evidence; or questions which, under the
condition of the evidence, it is proper for the court itself to
determine.   And we understand the contention of the appel-
lant to be, not that it was not proper for the trial court to
take a special verdict upon questions of fact involved in the
case, but that, under the testimony, and in view of the con-
ceded facts in the case, it was not proper for the court to
submit to the jury the question whether it was negligence
on the part of the appellant not to have maintained gates
and a flagman at the crossing at which the accident occurred
which gave rise to these proceedings.

Here again the question seems to be simplified for us and
the law to be fully and explicitly stated by the Supreme
Court of the United States.   In the case of the *Grand Trunk
Ry. Co.* v. *Ives*, 144 U. S. 408, 421, that court, by Mr. Justice
Lamar, said :

"As a general rule, it may be said that whether ordinary
care or reasonable prudence requires a railroad company
to keep a flagman stationed at a crossing that is especially
dangerous, is a question of fact for a jury to determine under
all the circumstances of the case, and that the omission to
station a flagman at a dangerous crossing may be taken
into account as evidence of negligence; although in some
cases it has been held that it is a question of law for the
court.   It seems, however, that before a jury will be war-
ranted in saying, in the absence of any statutory direction to
that effect, that a railroad company should keep a flagman
or gates at a crossing, it must be first shown that such cross-
ing is more than ordinarily hazardous; as, for instance,
that it is in a thickly populated portion of a town or city;
or, that the view of the track is obstructed either by the
company itself or by other objects proper in themselves; or,

that the crossing is a much traveled one and the noise of approaching trains is rendered indistinct and the ordinary signals difficult to be heard by reason of bustle and confusion incident to railway or other business; or by reason of some such like cause; and that a jury would not be warranted in saying that a railroad company should maintain these extraordinary precautions at ordinary crossings in the country." And then the learned justice in his opinion proceeds to cite numerous cases illustrative of the various phases of the rule which he had stated.

The crossing of Mount Olivet road over the track of the Baltimore and Ohio Railroad Company, where the accident here mentioned occurred, is some distance outside of the corporate limits of the city of Washington. It is not shown to be more than ordinarily hazardous. It does not appear to be in a thickly populated locality, or to be a much traveled crossing, or to be rendered unusually dangerous by bustle and confusion incidental to business of any kind. In fact, so far as the testimony in this case discloses, it is no more than an ordinary crossing in the country, where, under the distinct ruling of the Supreme Court, no such extraordinary precautions as gates and flagmen are required. If the peculiar conditions of the crossing required such extraordinary precautions, the testimony wholly fails to disclose the fact. In that testimony we find only two circumstances that have any bearing whatever upon the question. One of these is that horse races were in progress about this time at the Ivy City race track, in the neighborhood. But it is not shown that this brought any unusual concourse of persons to the neighborhood of the crossing in question, so as to make that crossing unusually dangerous. The other circumstance is that there was an embankment in the neighborhood of the crossing, which at certain points rendered impossible any extensive view of the road. But the testimony in that regard is unsatisfactory, and wholly insufficient for submission to a jury. It is that of a member

of the bar, formerly associated with the case, who only went out to the locality of the accident more than a month after its occurrence, and who testified as to how much of the track he could see northwards from the place where he supposed the cab to have been. He says:

"I am a member of the bar and was associated with counsel in the former trial of this case. I am familiar with said case and with the locality where the accident occurred. I examined said locality the spring after the accident occurred, about April, 1893. I tried to place myself in the position in which the driver of the cab must have been—that is, on the west side of the track, about ten or fifteen feet from the track. I tried to look up the track, but could not do so. I was on a Century bicycle, which raised me to the height of a man on an ordinary vehicle. There were a good many bushes at that point which had no leaves on them, but those bushes prevented me from seeing more than 65 or 100 feet up the track. There was a large embankment which prevented me from seeing up the track until I was within ten feet of the track. Until I got right on the track I could not see more than 50 or 60 feet up the track. . . . The railroad is a cut along there and the embankment is about 25 or 30 feet from the right of way of the railroad. The embankment and foliage along the track obstruct the view from the wagon road at this point. I mean to say that the obstruction to my view was 25 or 30 feet away from me and that the embankment was 10 or 15 feet away from the track. There was very little embankment immediately at the crossing. The trees, branches, bushes, and vines helped to obscure my view. After I got up on the track I could see up to the next station, Montello. When I got to the switch at the crossing I could see 50 or 60 feet up the track. I was prevented from seeing further up the track by the embankment, but the embankment where the road crosses the track was not more than 4 or 5 feet in height. When standing on the switch there is nothing to obstruct the view, but when a team is

standing on the switch the driver can see only 50 or 60 feet up the track because of the embankment. I think the track at this point is straight."

How insufficient this testimony is to go to a jury for the purpose of showing that the crossing in question was especially hazardous, and therefore necessitated the presence of gates or a flagman as a measure of ordinary prudence, is too evident to require comment. If effect is to be given to it, it would almost necessarily follow that there should be flagmen and gates at the crossing of every country road adjacent to tunnels, cuts, or embankments. Nor does it follow that, because at the particular point of the road, where this witness assumed the driver of the cab to have been, the view of the railroad is obstructed by an embankment, the driver might not have had an uninterrupted view before he reached that point and at a seasonable time to regulate his course of action.

Contrasted with the testimony of this witness, what the driver himself says is conclusive of the point. He said in his testimony, as it appears in the record: "When I got to the railroad, if I had stopped I could have seen up and down the railroad; I did not stop because it is not usual to stop at the railroad crossing; no one told me to stop." So that it is quite evident that there is nothing whatever in the testimony to show any unusually dangerous conditions in regard to this crossing that would distinguish it from any other crossing of a country road; and consequently there was nothing to warrant a jury in finding that the railroad company was under obligation to use extraordinary precautions at this point. The answer of the jury to the first question shows that, in its opinion, the company had taken all the usual and proper safeguards; had been diligent in the ringing of bells and the sounding of the whistle, and was not otherwise negligent; and the only ground for the liability which it was sought to fasten upon it was its failure to provide the extraordinary safeguards of gates and a flagman. In the absence of all statutory requirement; in the absence of all proof of

any unusually hazardous conditions at this crossing, we are required by the ruling of the Supreme Court in the case of *Grand Trunk Ry. Co.* v. *Ives, supra*, to hold that this ground is wholly untenable.

We are constrained, therefore, to hold that it was error in the trial court to submit to the jury, under the circumstances of this case, and the condition of the testimony therein adduced, the question whether the failure of the railroad company to maintain gates or a flagman at this crossing was not negligence on its part. And, as it is plain that the general verdict in favor of the plaintiff is based entirely on the opinion of the jury that such failure of the railroad company was negligence, that verdict cannot be sustained, and the judgment based upon it must likewise fail.

*The judgment of the Supreme Court of the District of Columbia in this cause must be reversed with costs, and the cause will be remanded to that court, with directions to vacate that judgment, to set aside the verdict and to award a new trial. And it is so ordered.*